Filed 9/22/22  In re Miguel R. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re MIGUEL R., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MIGUEL R.,<br><br>        Defendant and Appellant. | E078528<br><br>(Super.Ct.No. J279577)<br><br>OPINION |

Appeal from the Superior Court of San Bernardino County.  Bryan K. Stodghill, Judge.  Affirmed.

Gerald J. Miller, by appointment of the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Donald W. Ostertag, Deputy Attorneys General, for Plaintiff and Respondent.

1

A juvenile wardship petition (Welf. & Inst. Code, § 602, subd. (a)) was filed January 30, 2019, alleging that Miguel R., then age 17, committed one count of murder (Pen. Code, § 187, subd. (a)), one count of second degree robbery (Pen. Code, § 211), and one count of attempted second degree robbery (Pen. Code, §§ 211 & 664). The People filed a motion to transfer Miguel to adult criminal court. (Welf. & Inst. Code, § 707, subd. (a)(1).) Following a hearing over several days, the juvenile court determined that Miguel "is not amenable to the care, treatment, and training programs available through the juvenile court system" and ordered him transferred to adult criminal court. Miguel appeals the transfer order (Welf. & Inst. Code, § 801, subd. (a)), arguing that the juvenile court's ruling was based on improper evidence and a misapplication of the statutory criteria. (Welf. & Inst. Code, § 707, subd. (a)(3); unlabeled statutory references are to this code.) Finding no error, we affirm.

## BACKGROUND

### A. *The Alleged Offense*[1]

On Sunday evening, January 27, 2019, S.N. and his wife, K.N., were taking one of their regular walks near their home in Ontario when they saw three male teenagers approaching, dressed alike in black pants and black hoodies. S.N. told K.N. to get behind him and placed himself between the teenagers and his wife. The teens stopped in front of them, blocking their path, and the one in the middle, later identified as Miguel, pointed a gun at S.N.'s head. K.N. heard the gunman and one of the other two say, "'Hey,

---

[1] The facts of the offenses are taken from the probation report, which summarized the relevant police reports.

2

motherfucker, what you got?'" S.N. lunged toward the gunman, and a struggle ensued. K.N. saw a flash, heard S.N. yell, and realized he had been shot. S.N. was taken to the hospital, where he died during surgery.

An officer searching the area shortly after the shooting stopped three teenagers matching the suspects' description, two of whom were detained, while the third fled on foot. Other officers searching in the area where the third suspect had fled found a clean white T-shirt that appeared to have been recently discarded in an alley. Nearby was a black backpack containing a loaded .38-caliber revolver with one spent casing under the hammer, a black T-shirt, a black sweatshirt, a cell phone, and other items. In a parking lot nearby, officers found a wallet containing Miguel's California identification card, and a few feet away were six additional bullets matching the rounds in the revolver.

After initially providing officers with false information, both of the two detained coparticipants made statements incriminating Miguel, identified the backpack containing the gun as Miguel's, and identified Miguel as the shooter in photo lineups. Miguel was arrested at school the following morning. A search of Miguel's home revealed shoes and other clothing matching those worn by the shooter, as well as a box of .38-caliber ammunition matching that found in the revolver.

Text messages found on Miguel's cell phone and statements by his mother revealed that Miguel had texted his mother shortly after the shooting, saying he was hiding from the police. He could see police nearby and a helicopter overhead. She told him not to come out of hiding and drove to find him in Ontario, where she saw police and

3

blocked streets. Their text messages included four maps showing locations where Miguel was hiding, and their communications continued over the course of almost four hours before Miguel's mother was able to pick him up and bring him home. Miguel's mother identified the backpack, wallet, and identification found by police as belonging to Miguel, but she denied having seen the gun or ammunition before.

Surveillance video obtained by police showed Miguel, wearing a backpack matching that found by police, boarding a bus heading towards Ontario with his two coparticipants a few hours before the shooting. All three are wearing black hooded sweatshirts, dark jeans, and black shoes. They can be seen sitting together and talking before exiting the bus together. Other surveillance videos show the three youths at various locations in the vicinity before and after the shooting.

B. *The Juvenile Court Transfer Proceedings*

The prosecution filed a motion to transfer Miguel to criminal court, and Miguel filed a written opposition. The probation department submitted a report pursuant to subdivision (a)(1) of section 707, recommending transfer to criminal court. The juvenile court began its transfer hearing on April 14, 2021, with testimony from the sole prosecution witness, Cynthia Diaz, the probation officer who prepared the report. Diaz explained her methodology, the interviews she conducted, and the records she reviewed in preparing the report. The report recommended transfer to criminal court on the basis of four of the five statutory criteria: the degree of criminal sophistication exhibited by the minor, whether the minor can be rehabilitated before expiration of the juvenile court's

4

jurisdiction, the success of previous attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the offense. Diaz also reviewed a number of the detention behavior summaries documenting Miguel's conduct in juvenile hall over the two years since her report had been filed. She noted that Miguel was involved in eight incidents described as "code reds," all but one of which involved assaultive behavior on other minors. Although Miguel had obtained his high school diploma and enrolled in online community college courses, Diaz testified that Miguel was currently "suspended until further notice" from participating in the college program for having accessed unauthorized websites, and he had previously been suspended for a semester because of a plagiarism incident. On the basis of her review of Miguel's detention behavior summaries, Diaz continued to believe that Miguel was not amenable to treatment by juvenile services and should be transferred to adult court.

After several continuances to allow Miguel to obtain his complete education and medical records and retain an expert witness to perform an evaluation, the hearing resumed on December 13, 2021, with testimony from the sole defense witness, Shannon Johnson, Psy.D., a staff psychologist at Patton State Hospital. Johnson met with Miguel for about two hours in July and submitted a psychological evaluation report on July 20, 2021. She met with him a second time the following month for roughly 90 minutes and submitted a risk assessment report dated August 28, 2021.[2]

---

[2] Because Johnson had not been instructed to avoid interviewing Miguel about the circumstances of the charged offense, the parties stipulated that the risk assessment report would be redacted by defense counsel to remove any information regarding the

*[footnote continued on next page]*

Johnson testified that Miguel had demonstrated insight and expressed regret and remorse for the impact of his behavior on his family and on the victim's family, which Johnson believed was honest and genuine. She testified that Miguel had made progress in his rehabilitation, as evidenced by his ability to view his detention as an opportunity to recreate himself and consider how he would like his life to be in the future. Regarding her risk assessment evaluation, Johnson opined that Miguel was unlikely to seek out violence and that his strong family support mitigated his risk of reoffending, although if Miguel were subjected to violent conduct by someone, he was likely to defend himself. She testified that transferring Miguel to an adult incarceration setting would be destabilizing and have a negative impact on his functioning and eventual reintegration into the community. When asked if Miguel would present a low risk of reoffending or engaging in violence if he were treated in a juvenile facility, Johnson assessed Miguel's risk as "moderate" rather than "low."

On cross-examination, Johnson acknowledged that Miguel had continued to engage in violent behavior during his detention, but she described that behavior as largely "situational" and related to the incarcerated setting. Johnson conceded that Miguel's ongoing use of aggression to manage conflict did increase his risk of reoffending and that he is likely to respond with violence if he is challenged or approached in an aggressive way.

circumstances of the offense that may have been obtained from Johnson's discussions with Miguel. Johnson was also admonished not to testify as to any specific facts concerning the offense or Miguel's participation that she may have learned from Miguel during her evaluation.

Johnson was also asked during cross-examination about an incident on October 9, 2021, when a staff member had redirected Miguel to take it easy on the other team during a soccer tournament, and Miguel responded: "'You are telling me to chill out[?] You know I'm a murderer on the set.'" When questioned about his response, Miguel said, "'I'm a murderer. I kill people. So what?'" Johnson acknowledged that the statement was not something that Miguel would have said during their meetings, and she stated that if he had said that to her, it would have changed her opinion. Defense counsel objected to the line of questioning, arguing that it assumes facts not in evidence, there was no information provided about the context or tone of the statement, and it constituted inadmissible hearsay. The court overruled the objections, explaining that although the court had not received evidence of the statements, the court understood that the report of the incident "is evidence that is going to be presented later," and if not, the testimony would be subject to a motion to strike. The court further stated that it would not consider Miguel's statement for its truth and would allow the question as a hypothetical regarding Johnson's opinion: If Miguel had made such statements, how would that impact her evaluation, recommendation, and diagnosis?

When asked if the statement showed Miguel's lack of remorse and lack of empathy, Johnson said she could not tell without knowing more about the "situational factors" and circumstances in which the incident occurred. The remark may have been made "in a very escalated state" in order to posture for his peers and establish the pecking order so they "would not mess with him in the future." Alternatively, the statement could

7

have been "made in hopelessness," to express "'I'm never going to get out of here because things like this keep happening. I give up.'"

At the conclusion of Johnson's testimony, the prosecution offered to recall the probation officer, Diaz, as a rebuttal witness to testify regarding the detention behavior summary that reported Miguel's October 2021 statements and also to establish that Miguel was again not enrolled in college classes that semester. Defense counsel renewed his hearsay objection, and the court again overruled it. The court explained that the statements are not hearsay because they are not offered for their truth, because the question of whether Miguel is in fact a murderer is not at issue in the transfer hearing. The court admitted the statements as evidence of Miguel's state of mind, his behavior while detained in juvenile hall, and "what that indicates about his future prospects for rehabilitation and for offending." The court found the detention behavior summaries to be reliable and admissible as government records. It explained that the summaries were reviewed by Diaz and provided part of the basis for the probation report she prepared, and they also contained many positive reports of Miguel's custodial behavior and accomplishments. The court stated that it would consider all of the detention behavior summaries, including the report containing Miguel's October 2021 statements. Defense counsel agreed, stating: "Judge, given the Court's explanation of the admissibility, I'm comfortable simply submitting on the document given the fact that the Court is considering it for—appropriately for the evidentiary purposes. So I am fine with that,

8

Judge." The court responded: "Then that detention behavior summary is a part of the court file the Court will review."

Both counsel agreed to submit on the document containing the October 2021 statements and stipulated to the fact that Miguel was not attending online college classes that semester, so Diaz was not recalled. After accepting some character reference letters submitted by the defense, the juvenile court heard argument on the transfer motion from both counsel and took the matter under submission.

C. *The Juvenile Court's Ruling on the Transfer Motion*

On January 21, 2022, the court issued its ruling on the transfer motion. It found Miguel was not amenable to the care and treatment in the juvenile justice system and ordered him transferred to criminal court. After describing the offense and the investigation, the court addressed each of the five statutory criteria in detail.

As to the degree of criminal sophistication exhibited by the minor (§ 707, subd. (a)(3)(A)), the court found that factor weighed in favor of transferring Miguel to criminal court. The court found that Miguel had armed himself, participated in a preplanned armed robbery that was inherently dangerous and showed indifference to human life, and willfully shot the victim for his failure to comply. The court also found that Miguel's conduct after the shooting exhibited a higher level of criminal sophistication in that he fled, attempted to conceal his involvement by changing his clothing and appearance, and then lied to police about his involvement.

9

On the second criterion, whether the minor can be rehabilitated before expiration of the juvenile court's jurisdiction (§ 707, subd. (a)(3)(B)), the court discussed in detail the programs that are offered at the secure youth treatment facility to which Miguel could be committed by the juvenile court, the timeframe of less than five years that remained available for treatment and rehabilitation, Miguel's past response to services offered while on probation for his prior offenses, and Miguel's rehabilitation progress in detention since the shooting. The court noted that Miguel had been the subject of a March 2016 petition alleging that he committed burglary and vandalism, and he was initially granted deferred entry of judgment, which he failed to complete. He was declared a ward of the court and placed on formal probation with electronic monitoring in December 2017, but he failed to comply with the probation terms and was ordered into placement in May 2018. After successfully completing a six-month placement at Boys Republic, Miguel was maintained on house arrest for 60 days beginning in November 2018. Although it appeared he was making rehabilitative progress, he planned and committed the instant offense shortly after his release from house arrest despite nearly three years of rehabilitative services and court supervision. The court found that history strongly suggested that Miguel was unlikely to have a positive response to further juvenile court services.

The court described Miguel's conduct during detention on the instant offense as "diverse." While he did have numerous positive reports, graduated from high school, attended college courses, participated in numerous rehabilitative programs, and achieved

10

honors for several months, he also physically and verbally assaulted peers and staff, was involved in several "code red[]" incidents, and was banned from attending college courses because of his negative behaviors. The court described the October 2021 incident in which Miguel said, "'I'm a murderer. I kill people. So what?'" as "[p]erhaps the most egregious" incident of Miguel's negative behavior in detention. The court acknowledged that Miguel's custodial conduct had improved in 2021 and that he appears to have benefitted from rehabilitative services, suggesting his amenability to rehabilitation in juvenile court, but stated that the October 2021 incident indicates a lack of remorse and calls into question whether his apparent progress has been genuine. Given Miguel's negative behavior while on deferred entry of judgment and probation for the prior offenses, in contrast to his substantially positive and improving pattern of behavior during detention, the court determined that the "evidence is simply insufficient for the Court to draw a conclusion as to whether or not the minor can be rehabilitated and as to whether there is enough time for rehabilitation." The court accordingly found that the prosecution had not carried its burden of proving that this factor weighed in favor of transfer to criminal court.

On the third statutory factor, the minor's previous delinquent history (§ 707, subd. (a)(3)(C)), the court found it weighed in favor of remaining in juvenile court. The court found that Miguel's criminal history was minimal, consisting of a single petition in 2016 alleging two nonviolent felony counts, and that although Miguel had trouble complying with the terms of probation, his violations were not due to criminal conduct.

Regarding the fourth factor, the success of previous attempts by the juvenile court to rehabilitate the minor (§ 707, subd. (a)(3)(D)), the court found it weighed in favor of transfer to criminal court. The court found that Miguel had been provided the entire spectrum of services, including probation, community service, wraparound services, classes including gang intervention, house arrest, and a six-month out-of-home placement that included counseling, but none of it succeeded in modifying his behavior.

Regarding the fifth criterion, the circumstances and gravity of the offense alleged in the petition (§ 707, subd. (a)(3)(E)), the court found it weighed heavily in favor of transfer to criminal court. The court noted that not only did Miguel willingly engage in highly dangerous activity but he also was seemingly committed to completing it at all costs, resulting in irreparable consequences—the death of S.N. The court further found that there were no mitigating factors regarding Miguel's participation in the offense.

In conclusion, the court found three of the five statutory criteria—the degree of criminal sophistication, the success of previous attempts at rehabilitation, and the gravity and circumstances of the offense—weighed in favor of transfer to criminal court, only Miguel's minimal delinquency history weighed against, and the likelihood of rehabilitation was neutral. The court found that Miguel's minimal delinquency history was complicated by his poor performance while on probation, his failure to complete probation, and the fact that he was still on probation when he committed the instant offense, all of which reduced the degree to which that criterion supported denial of the transfer motion. In contrast, the court found the high degree of criminal sophistication,

12

the failure of previous rehabilitative efforts, and the grave consequences of his action in the alleged offense were dispositive and weighed heavily in favor of transfer to criminal court. Accordingly, the court found Miguel is not amenable to the care and treatment of the juvenile justice system and ordered him transferred to criminal court.

## DISCUSSION

"When a minor has been charged in the juvenile court with any felony allegedly committed when he or she was 16 years of age or older, the prosecutor 'may make a motion to transfer the minor from juvenile court to a court of criminal jurisdiction.' (§ 707, subd. (a)(1).) Upon the making of such a motion, the juvenile court must order the probation department to prepare 'a report on the behavioral patterns and social history of the minor.' (*Ibid*.)" (*J.N. v. Superior Court* (2018) 23 Cal.App.5th 706, 711 (*J.N.*).) At the hearing on the prosecution's motion, the court must consider the probation report and "any other relevant evidence that the petitioner or the minor may wish to submit." (§ 707, subd. (a)(3).)

In making the determination whether the minor is "a fit and proper subject to be dealt with" by the juvenile court or should be transferred to criminal court, the court must consider five criteria set forth in section 707, subdivision (a)(3). (§§ 606, 707, subd. (a)(3).) "Those factors are the minor's degree of criminal sophistication, whether the minor can be rehabilitated in the time before the juvenile court would lose jurisdiction over the minor, the minor's prior history of delinquency, the success of prior attempts by the juvenile court to rehabilitate the minor, and the circumstances and gravity of the

charged offense. [Citation.]" (*J.N.*, *supra*, 23 Cal.App.5th at p. 711.) The weight that the juvenile court assigns to each of those factors rests within its sound discretion. (*C.S. v. Superior Court* (2018) 29 Cal.App.5th 1009, 1034-1035 (*C.S.*).) The juvenile court must clearly and explicitly articulate its evaluative process by detailing how it weighed the evidence and by identifying the facts that persuaded the court to reach its decision. (*Id*. at p. 1035.) "Whether the youth committed the act alleged in the petition is not the issue in such a determination; the sole question is whether he would be amenable to treatment in the event that he is ultimately adjudged a ward of the court." (*People v. Chi Ko Wong* (1976) 18 Cal.3d 698, 716.) Effective January 1, 2022, subdivision (a) of section 801 provides for immediate appellate review of a juvenile court's transfer order. (§ 801, subd. (a), added by Stats. 2021, ch. 195, § 1.)

We review the juvenile court's ruling on a transfer motion for error under an abuse of discretion standard. (*People v. Superior Court* (*Jones*) (1998) 18 Cal.4th 667, 680 (*Jones*).) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.) The juvenile court's findings with respect to each of section 707's five criteria are findings of fact reviewed for substantial evidence. (*Jones*, *supra*, 18 Cal.4th at pp. 682-683) "The standard is deferential: 'When a trial court's factual determination is

attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.]" (*Id*. at p. 681.)

Miguel argues that the transfer order must be reversed because the juvenile court relied on "[i]mproper [e]vidence" (boldface omitted), namely, the detention behavior summary describing the October 2021 incident when Miguel told staff, "'I'm a murderer. I kill people. So what?'" Miguel argues that absent any evidence as to the "tone" or "context" of the remarks, they are "worthless as an indication of appellant's purported state of mind." We disagree.

First, insofar as Miguel argues that the juvenile court abused its discretion by admitting the evidence, he has forfeited the argument by expressly withdrawing his objections in the juvenile court. For the same reason, he has forfeited any claim that the juvenile court was prohibited from relying on the evidence because it was not "formally admitted." When defense counsel withdrew his objections, he also expressly conceded that the juvenile court was properly considering the report containing Miguel's statements. In any event, the court's evidentiary ruling was correct for the following reasons: The statements were offered as nonhearsay evidence of Miguel's state of mind, not to prove that he was in fact a murderer; the statements were admissible as party admissions; and the report containing the statements was admissible as a business record or an official record of the probation department. (Evid. Code, §§ 1200, 1220, 1271,

15

1280.)  Miguel argues that there was no testimony establishing that the report satisfies the foundational requirements for admissibility as a business record (Evid. Code, § 1271), but that is why the forfeiture rule applies—if defense counsel had not withdrawn the objection, the prosecution could have introduced evidence to address it.  Regardless, the report is also presumptively admissible as an official record (Evid. Code, §§ 664, 1280) unless the objecting party presents evidence that it lacks trustworthiness, which Miguel did not.  (*People v. Hall* (2019) 39 Cal.App.5th 831, 842-844; *People v. Martinez* (2000) 22 Cal.4th 106, 125-127.)  Moreover, after withdrawing his objections, defense counsel relied on the detention behavior summaries in arguing that Miguel's custodial conduct demonstrates that he "has the right state of mind to being rehabilitated," stating that "there are far more positive [detention behavior] summaries than there are negative summaries" and that "the Court has them and can review them.  I think that is important in considering whether or not he is amenable to further treatment in the juvenile justice system."  Having expressly withdrawn his objections and urged the juvenile court's consideration of the evidence, Miguel cannot now argue that the evidence was inadmissible or otherwise not a proper subject of the court's consideration.  (*People v. Jones* (2003) 29 Cal.4th 1229, 1255; *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1097-1098 [hearsay statements properly admitted where contained in reports that were prepared by probation officers performing official duties and that were relied upon by both parties without objection].)

Second, we disagree with Miguel's argument that the absence of evidence as to the tone or context of the statements renders them "worthless as an indication of" Miguel's state of mind reflecting a lack of remorse. Miguel suggests the remarks may have been made "out of mere frustration, or in sarcastic response to what [Miguel] may have viewed as an incongruous request that he 'chill out' or 'take it easy on the other team.'" At bottom, Miguel's arguments concerning the tone and context of the statements simply point out their ambiguity. "Defendant is correct that the statement is ambiguous, but the ambiguity does not render it inadmissible . . . ." (*People v. Young* (2019) 7 Cal.5th 905, 927.) "Defendant's contention that the challenged statement was ambiguous and equivocal 'concerns only the weight of this evidence, not its admissibility, which does not require complete unambiguity.'" (*Ibid.*; *People v. Ochoa* (2001) 26 Cal.4th 398, 438.)

Moreover, contrary to Miguel's claim that the lack of evidence of tone and context prevented the court from considering other possible interpretations of the October 2021 statements, the record shows the juvenile court did just that. When asked if the statement showed a lack of remorse or empathy, Johnson testified that "situational factors" relating to the "incarcerated setting" influence "what you chose to say" and that "the circumstances [surrounding the statements] are somewhat lacking." Johnson suggested that Miguel's statements may have been "posturing for the peers" so they "would not mess with him in the future," or the statements may have been an expression of hopelessness, but she could not tell from the statements alone "without knowing the full

scale of that moment." The juvenile court, in discussing Miguel's statement, acknowledged "that sometimes people say things that they don't really mean[,] and the Court accepts that this may be a possibility." Nonetheless, the court stated that "the minor's statements, regardless of the reasons he made them, reflect a callous mindset and call[] into question whether he has made any real rehabilitative progress." As the finder of fact, the juvenile court was free to reject the interpretations proffered by the defense's expert witness. (*People v. Engstrom* (2011) 201 Cal.App.4th 174, 187.) Instead, it took the statements at face value, making the reasonable inference that Miguel's statement, "'I'm a murderer. I kill people. So what?'" expresses a lack of remorse. Where conflicting inferences may be drawn from the evidence, "'the reviewing court must accept the inference drawn by the trier of fact so long as it is reasonable.'" (*Herpel v. County of Riverside* (2020) 45 Cal.App.5th 96, 100.)

We also reject Miguel's related argument that the juvenile court unduly focused on "the isolated October 9, 2021[,] comment," allowing it to "obscure" and "minimize[] the various factors favoring" Miguel's retention in the juvenile court. The juvenile court did not consider the October 2021 statements in isolation; rather, it viewed the incident as only Miguel's "most prominent negative conduct" while in detention, which also included "physically and verbally assaulting peers and staff and refusing to cooperate with staff directives," being "involved in at least five code reds," and being "banned from attending college courses due to his negative behavior." Even before the October 2021 incident, Johnson's risk assessment report acknowledged that despite Miguel's "insight

18

and reported change in perspective," he "has continued to engage in acts of aggression" in custody, including a recent "code red" incident in which Miguel used violence on another minor and a taser was deployed to gain his compliance. We also note that the custodial misconduct continued even after the juvenile court cautioned Miguel directly that the court was carefully observing his behavior in juvenile hall, that he needed to turn around his negative behavior to demonstrate his overall rehabilitation, and that his detention conduct would be evaluated at the transfer hearing, "which has the potential of sending you to adult court." In addition to Miguel's negative custodial conduct, as previously mentioned, the court also took into consideration his poor response to juvenile court services after the 2016 petition, noting that Miguel's behavior had escalated the matter from deferred entry of judgment to wardship and formal probation to out-of-home placement, all of which had failed to deter the instant offense from occurring while he was still on probation.

The record also does not support Miguel's claim that the court minimized or ignored contrary evidence. The court stated that Miguel had "demonstrated perfect conduct . . . on numerous occasions," and the court listed many other "exceptional accomplishments" of his, including having "graduated from high school, attended college courses, participated in numerous rehabilitative programs and counseling" as well as "a program in which he makes beanies and blankets for the homeless," and having "achieved honor room status" and been named "citizen of the month for the last four months." The court gave Miguel "significant credit for his continually improving

19

custodial behavior," which it called "the single most compelling and substantial factor weighing in favor of the minor remaining in the juvenile court." However, the court found the overall positive trend in Miguel's detention conduct was "neutralized by his significant and periodic negative behavior." In sum, the court's factual findings were supported by substantial evidence, and the weight assigned to the various positive and negative factors was well within the court's discretion.

Miguel also contends that the juvenile court erred by finding that the criminal sophistication criterion weighs in favor of transfer to criminal court, arguing the offense was a "simple case of an attempted robbery gone bad." We disagree. Miguel never addresses the juvenile court's analysis of the criminal sophistication finding, which was well supported by the record. The court relied on the evidence showing Miguel's willing participation in a preplanned armed robbery, his preparation by arming himself with a loaded firearm, his willingness to shoot the victim when the victim did not comply, his subsequent flight, his attempts to change his clothing and appearance, and his lies to police to conceal his involvement. The juvenile court was not obligated to agree with Miguel's claim that his conduct does not "reflect[] premeditation or planning," given the overwhelming evidence to the contrary.

Miguel also contends the court "unduly emphasized the gravity of the charged offense." The argument is meritless. The weight to be accorded to each of the statutory criteria is left to the discretion of the juvenile court (*C.S.*, *supra*, 29 Cal.App.5th at pp. 1034-1035), and Miguel has not shown an abuse of discretion. The court determined

that three factors weighed in favor of transfer, one weighed against, one was neutral, and the balance favored transfer. All of those determinations were supported by the record, and Miguel has not shown that the court's weighing of the gravity of the offense constituted an abuse of discretion.

Finally, Miguel attempts to liken this case to *J.N.*, in which the appellate court held that substantial evidence did not support the juvenile court's finding that the circumstances and gravity of the offense favored transfer to criminal court. (*J.N.*, *supra*, 23 Cal.App.5th at p. 724.) Miguel's claim that, "as in *J.N.*, there was evidence that the shot was fired only as a result of a struggle between appellant and the victim" is a gross misrepresentation of that case. There was no struggle between the appellant and the victim in *J.N.* because J.N. was unarmed and "did not kill anyone." (*Id.* at p. 711.) "J.N. was not the shooter" and "did not have any intent to kill." (*Id.* at p. 724.) "J.N. was shocked when the killing occurred and stood frozen" (*ibid.*) during the struggle between another minor and an adult rival gang member. (*Id.* at p. 712.) J.N. also presented "[e]xtensive evidence" of trauma affecting his mental and emotional development to mitigate the gravity of the offense. (*Id.* at pp. 716, 724.) Miguel's two-page discussion of *J.N.* omits all of those highly relevant distinguishing facts. We consequently are not persuaded that *J.N.* offers any support for Miguel's argument that the juvenile court accorded undue weight to the gravity of the offense.

21

DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

MILLER
Acting P. J.

SLOUGH
J.

22